**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SHIP SHAPE MAINTENANCE CO., INC., Respondent.**

**No. 71-1849.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 22, 1972.

Decided Dec. 1, 1972.

Wilbur K. Miller, Senior Circuit Judge, dissented in part and concurred in part.

---

Mr. Jonathan G. Axelrod, Atty., N. L. R. B., with whom Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, and Mrs. Nancy M. Sherman, Atty., N. L. R. B., were on the brief, for petitioner.

Mr. Michael E. Jaffe, Washington, D. C., for respondent. Messrs. Allen G. Siegel and Lee M. Modjeska, Washington, D. C., were on the brief for respondent.

Before WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

The National Labor Relations Board (Labor Board) has petitioned this court for enforcement of a remedial order entered against the Ship Shape Maintenance Company (hereinafter the "Company"), which resulted from the Labor Board's finding that the Company had violated certain unfair labor practice provisions of the National Labor Relations Act, as amended (N.L.R.A.).[1] The Company has challenged both the sufficiency of the evidence supporting the Labor Board's unfair labor practice determinations and the propriety of a por-

---

1. Ship Shape Maintenance Co., Inc., 189 NLRB No. 58, 1971 CCH NLRB ¶ 22,879 (1971).

tion of the Board's remedial order. For the reasons discussed below, we grant enforcement of the Labor Board's order, as modified by our rejection of its proposed bargaining order.

### I

The Company is a Maryland corporation which provides janitorial services in approximately 35 office buildings in Washington, D. C. On October 19, 1969, the Company obtained the contract to clean the building at 500–550 12th Street, S.W. (hereinafter the "500–550 building"), and it commenced work at this location on the evening of October 20. The nature of the Company's business is such that it generally has a high rate of employee turnover. It employs approximately 600 persons at all of its locations. During 1969, it employed about 1800 different individuals, only 300 of whom were relatively permanent employees, to fill these 600 positions. Between January 1, 1970, and July 9, 1970, it employed 149 different persons at the 500–550 building, with an average work complement of 35–40.

Before the Company obtained the 500–550 building contract, Service Employees International Union, Local 536, AFL–CIO (hereinafter the "Union") had been engaged in a campaign to organize the employees of the predecessor supplier of janitorial services there. When the Company assumed its cleaning duties, the Union altered its organizing campaign to concentrate on the new Company personnel. Within several days, the Union obtained authorization cards ostensibly signed by 17 Company employees.

On October 24, the Union wrote to the Company, claiming to represent a majority of the 28 statutory "employees"[2]

at the 500–550 building and demanding recognition. The Company did not respond to the Union's request. Simultaneous with its letter to the Company, the Union filed a representation petition with the appropriate Regional Office of the Labor Board, requesting a representation election among the Company employees at the 500–550 building. The Regional Office mailed notification of the Union's petition to the Company on October 27.

Sometime during November, 1969, Company President James Netterstrom decided to utilize the 500–550 building as a training facility for new employees, before transferring them to other locations[3] where the Company performs janitorial services. However, at no time did Netterstrom or the Company's attorneys reveal to the Labor Board or to the Union that the Company considered the 500–550 building to be a training site and that, consequently, employees would work there only temporarily prior to being reassigned to other Company locations. Nor did the Company ever disclose this decision to the realty management firm with which it had contracted to clean the 500–550 building, or to the Company employees working there.

On December 2, the Company and the Union executed a stipulation for certification consent election agreement, which was approved by the Board's Regional Director on December 3, covering the 500–550 building employees of the Company. This stipulation limited voting eligibility to those employees working in the proposed unit[4] during the week ending November 22, excluding "any employees who have since quit or been discharged for cause." The election was scheduled for the evening of

---

2. *See* section 2(3) of the N.L.R.A., 29 U.S.C. § 152(3) (1970), for the statutory definition of the term "employee."

3. Some of these other Company locations have already been organized, while others have not.

4. The bargaining unit was defined to include:

All employees employed by the Employer at its 500–550 12th Street, S.W., Washington, D.C. location working as maids, porters, janitors, charwomen, waxers and buffers but excluding office clerical employees, guards and supervisors as defined in the Act.

The Company conceded that this unit was appropriate for collective bargaining, and the Labor Board agreed.

January 9, 1970, in the basement store-room of the 500–550 building.

On December 5, 1969, Netterstrom mailed to the Regional Office the list of employees required under the Labor Board's *"Excelsior"* doctrine.[5] This list, which contained 32 names, purported to cover the Company's employees at the 500–550 building as of November 22, 1969.

By January 2, 1970, one week before the scheduled representation election, 16 of the 32 persons named on the *Excelsior* list had left the Company's employ for reasons not at issue here. On the evening of January 2, 15 of the 16 persons on the *Excelsior* list who were still in the company's employ worked their final shift at the 500–550 building. Three of these persons quit on that day, and two more were terminated for reasons not relevant here. The remaining 11 persons on the *Excelsior* list were informed on January 2 that they were being transferred to other Company locations. One other employee who had been hired into the 500–550 building unit after November 22, 1969, and who was therefore not on the *Excelsior* list or eligible to vote in the representation election, was also included in the transfer order.

All but one of the 11, a supervisor,[6] were ordered to report on Monday evening, January 5, to one or another of the other buildings where the Company performed cleaning services. Two of these employees did not report for work as ordered, and they never worked for the Company again. Eight reported to their new assignments on January 5, and were working at their new locations on the date of the January 9 election. Subsequently, one of these eight quit at the end of January, 1970, and another quit in March, 1970. During the week of January 5, 1970, the Company performed its chores at the 500–550 building with a full complement of approximately 30 employees, all of whom had been hired after the November 22, 1969, representation election eligibility date.

On January 9, 1970, the Labor Board's election agent endeavored to conduct the scheduled representation election, despite notification from the Company's attorney that it considered none of the employees on the *Excelsior* list eligible to vote, due to the fact that all of the named individuals were no longer employed at the 500–550 building. Only one person named on the *Excelsior* eligibility list appeared, and she was only permitted to cast a challenged ballot.[7] No other persons voted in the election.

Shortly after the election, the Union filed timely objections to conduct which allegedly affected the results of the election. On January 19, 1970, the Union filed an unfair labor practice charge with the Labor Board, alleging violations of sections 8(a)(1), (3), and (5) of the N.L.R.A.,[8] and a complaint was is-

---

5. In Excelsior Underwear, Inc., 156 NLRB 1236 (1966), the Board announced a new practice of requiring employers to provide the names and addresses of eligible employees to candidate labor organizations prior to Board representation elections. This policy was approved by the Supreme Court in N.L.R.B. v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

6. This supervisor was told on January 2 to report for work at another building on January 7, instead of January 5. She reported to the new location as ordered, but quit about a week later for reasons immaterial to this case. *See* note 10, *infra.*

7. Two or three other employees of the Company appeared at the polls, but after ascertaining that they had all been hired after the November 22, 1969 eligibility date, the Labor Board election agent informed them that they were ineligible to vote.

8. 29 U.S.C. § 158(a) (1970) provides:
    (a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
    *    *    *    *    *
    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: . . .
    *    *    *    *    *

sued pursuant to this charge. The election objections were consolidated with the unfair labor practice complaint "for the purpose of hearing, ruling and decision by a Trial Examiner." [9]

In July, 1970, a hearing was held before Trial Examiner Benjamin Blackburn, wherein the above-described factual circumstances were presented. Company President Netterstrom admitted during his testimony that not he, but Melvin Shumaker, general manager, operations manager, and Company vice president, made the actual decision to transfer the employees in question. Netterstrom indicated that only Shumaker really had personal knowledge of the particular reasons underlying individual transfer selections. However, despite the fact that the General Counsel of the Labor Board subpoenaed Shumaker, he did not appear in response to the subpoena; neither was he called as a witness by the Company.

The Trial Examiner determined that the Company violated sections 8(a)(1) and (3) of the N.L.R.A., by transferring 10 employees on January 2, 1970, from the 500–550 building in order to remove all remaining eligible voters [10] from the proposed unit and thus preclude the holding of the Board representation election on January 9, 1970. The Trial Examiner, however, dismissed the section 8(a)(5) part of the complaint, since he concluded that only 14 of the 17 authorization cards proffered by the Union were in fact valid,[11] thus causing the Union to fall one vote short of the requisite majority of the 28 statutory "employees" who were found to have been employed in the appropriate unit on the date the rejected demand for recognition had been made by the Union.

The Labor Board completely affirmed the Trial Examiner's 8(a)(1) and (3) determination, concerning the Company's discriminatory transfer of all eligible voters on January 2. However, it reversed the Examiner's section 8(a)(5) finding. The Board validated all 17 of the Union's proffered authorization cards, and it concluded that the Company violated section 8(a)(5) by refusing to accede to the Union's demand for recognition in October, 1969.

The Labor Board adopted the Trial Examiner's proposed remedial order which ordered the Company to cease and desist from violating the N.L.R.A. and which affirmatively ordered the Company (1) to offer those employees who were discriminatorily transferred in violation of the Act and who were still in the Company's employ, immediate transfer back to their former positions at the 500–550 building, discharging, if necessary, presently employed persons; (2) to make whole all eight discriminatorily transferred employees who remained in the employ of the Company following their transfer, for any losses they may have sustained as a direct result of the Company's illegal action; (3) to bargain, upon request, with the Union concerning the wages, hours, and working conditions

---

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

The pertinent part of 29 U.S.C. § 157 (1970) is set out in note 30, *infra*.

9. Under the Labor Board's *Irving Air Chute* rule, where the Board has held an election which the union has failed to win, pre-election violations of sections 8(a)(1) or (5) of the Act will not be remedied by a bargaining order, which the Union requested in the instant case, unless the election is set aside. Irving Air Chute Co., Inc., Marathon Division, 149 NLRB 627, 629–630 (1964), enfd.,

350 F.2d 176 (2d Cir. 1965). This is the reason the Union filed objections seeking to have the January 9, 1970 representation election set aside.

10. The eleventh transferee was a "supervisor" within the meaning of section 2(11) of the N.L.R.A., 29 U.S.C. § 152 (11) (1970), who was therefore ineligible to vote in the "employee" representation election. Section 2(3) of the Act, 29 U.S.C. § 152(3) (1970) defines "employee" so as to expressly exclude "any individual employed as a supervisor."

11. The Trial Examiner concluded that 3 of the proffered authorization cards were not adequately authenticated.

of the employees in the appropriate bargaining unit at the 500–550 building; [12] and (4) to post appropriate notices.

The immediate enforcement action was necessitated by the Company's refusal to comply with the Labor Board's remedial order.

## II

The Company has asserted that there is insufficient evidence in the record to support the Labor Board's unfair labor practice findings. However, we conclude that there is adequate factual basis for the 8(a)(1) and (3) determination of the Board, which adequately supports the modified remedial order which we are enforcing.[13]

■ Although there is no *direct* evidence of the Company's illegal discriminatory intent with respect to its pre-election transfer of all of the eligible voters who then remained in the 500–550 building unit, there is substantial evidence in the record considered as a whole to support its 8(a)(1) and (3) determination. See section 10(e) of the N.L.R.A., 29 U.S.C. § 160(e) (1970); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456

(1951). *See also* International Union, United Automobile, Aerospace and Agricultural Implement Workers v. N. L. R. B., 129 U.S.App.D.C. 196, 200, 392 F.2d 801, 805 (1967), cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968).

It would indeed be the unusual case in which the link between the [discriminatory action] and the [protected] activity could be supplied exclusively by direct evidence. Intent is subjective and in many cases the discrimination can be proven only by the use of circumstantial evidence. Furthermore, in analyzing the evidence, circumstantial or direct, the Board is free to draw any reasonable inferences.

N. L. R. B. v. Melrose Processing Co., 351 F.2d 693, 698 (8th Cir. 1965).[14]

The Company was aware of the Union's claimed majority status concerning the 500–550 building employees by the latter part of October, 1969. Sometime in November of 1969, Company President Netterstrom decided to utilize this building as a training facility, which would necessitate the regular transfer of the employees working there to other build-

12. The Labor Board based its bargaining order in substantial part upon its finding of a section 8(a)(5) violation by the Company. Although the Trial Examiner had recommended dismissal of the section 8(a)(5) portion of the complaint, due to his determination that the Union had not obtained authorization cards from a majority of unit employees, he had still recommended issuance of a bargaining order, since he concluded that such a remedy was necessary to rectify the continuing effects of the Company's violation of sections 8(a)(1) and (3) of the Act. In its decision, the Labor Board expressly indicated that, contrary to the view of the Trial Examiner, the facts of this case did *not* warrant issuance of a bargaining order based upon the 8(a)(1) and (3) violation alone. *See* Ship Shape Maintenance Co., Inc., 189 NLRB No. 58, 1971 CCH NLRB ¶ 22,879 (1971) slip op. at 2 n. 3, 5.

13. Since we are denying enforcement of the bargaining order portion of the Labor Board's remedial order (*see* Part III of

this opinion, *infra*), there is no need for us to resolve the highly controversial section 8(a)(5) refusal to bargain findings which formed the basis for the Labor Board's bargaining order. The Board's 8(a)(1) and (3) determination, which we herein affirm, forms an adequate basis to support the remaining parts of the remedial order which we are wholly enforcing. *See* note 18, *infra*.

14. We must remember that " '[t]he judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body' * * * [, for] the findings of the Board and the Trial Examiner, especially when, as in the instant case, they [have] concur[red], are not lightly to be disregarded." International Union, United Automobile, Aerospace and Agricultural Implement Workers v. N.L.R.B., 129 U.S.App.D.C. 196, 200, 392 F.2d 801, 805 (1967), cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968).

ing locations as they became adequately trained. Nevertheless, when the Company thereafter conferred with Union representatives and a Labor Board agent to arrange for the representation election requested by the Union, the Company did not inform them of the new personnel policy at the 500–550 building, notwithstanding the fact that the new policy's concomitant high rate of regular turnover might greatly affect the composition of the proposed unit. Since the agreed-upon election date of January 9, 1970, was approximately a month and a half after the November 22, 1969, voter eligibility date, it should have been obvious to the Company that its new policy could affect the election—as subsequent events demonstrated—and it was reasonable for the Trial Examiner and the Labor Board to view the Company's silence on this point as some evidence of bad faith on its part.

■■ The timing and actual composition of the transfers similarly support the Labor Board's determination regarding sections 8(a)(1) and (3). Only one week before the scheduled representation election,[15] the Company transferred *every single eligible voter* out of the 500–550 building unit, yet only one ineligible employee was included in the transfer order.[16] This is certainly strong indication of a Company desire to frustrate entirely the holding of the scheduled election, thereby depriving the Union and the employees of the representation opportunity which they sought. Furthermore, as the Labor Board properly recognized, it was justifiable for it to draw an adverse inference from the fact that Shumaker, the Company official with actual knowledge of the specific reasons for the particular transfers, refused to appear to testify, despite the fact that he was subpoenaed. *See* International Union, United Automobile, Aerospace and Agricultural Implement Workers v. N. L. R. B., 148 U.S.App.D.C. 305, 311–315, 459 F.2d 1329, 1335–1339 (1972) and cases cited therein; N. L. R. B. v. A.P.W. Products Co., 316 F.2d 899, 903 (2d Cir. 1963).[17]

15. *See, e. g.*, N.L.R.B. v. Sutherland Lumber Co., 452 F.2d 67, 69 (7th Cir. 1971): "The abruptness of a discharge and its timing are persuasive evidence as to motivation." *See also* N.L.R.B. v. Montgomery Ward & Co., 242 F.2d 497, 502 (2d Cir.), cert. denied, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957). We believe that this same reasoning is applicable to a pre-election transfer of all eligible voters from a proposed bargaining unit.

16. *See, e. g.*, N.L.R.B. v. Dinion Coil Co., 201 F.2d 484, 486 (2d Cir. 1952), wherein the court indicated that "the fact that * * * more than 90% of those discharged * * * were members of the union suffices to make not unreasonable the Board's inference that respondent discriminated against union members * * *". In the instant case, over 90% of those notified on January 2, 1970, that they were being transferred to other locations were eligible to vote in the representation election scheduled for January 9, 1970. The inference which could reasonably be drawn from this fact supports the Labor Board's conclusion that the Company's pre-election transfer decision was motivated, at least in part, by a desire to frustrate the statutory right of the eligible employees to take part in the scheduled representation election. *See* note 17, *infra*.

17. Although the Company has attempted to justify the imbalance between eligible and ineligible voters in the transfer group by arguing that the eligible voters had been at the training site (*i. e.*, the 500–550 building) for a greater length of time than had been the ineligible personnel, we believe that the over-all record adequately supports the Labor Board's adverse interpretation regarding this factor. Very strong support for the Board's determination derives from the fact that none of the eligible voters had been provided with any pre-transfer indication *that they might be so transferred*. It is also informative that neither the Union nor the Board election agent was informed of the new Company policy prior to the time of its actual implementation one week before the scheduled representation election. Finally, the adverse inference which *could reasonably be drawn* from Shumaker's refusal to testify concerning the specific reasons for the particular transfers provides additional support for the Board's determination.

We therefore find that substantial evidence on the record considered as a whole supports the Labor Board's 8(a)(1) and (3) determination, concerning the Company's unlawful effort to frustrate the holding of the representation election which the Union had requested.

### III

Although we have affirmed the Labor Board's finding regarding sections 8(a)(1) and (3), and are therefore enforcing the portions of its remedial order pertaining to this unfair labor practice violation,[18] we are unable to grant enforcement to the Board's proposed bargaining order.

The controlling principles to be applied concerning the propriety of bargaining orders in cases of this type, were enunciated by the Supreme Court in N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Although the Court approvingly noted the Labor Board's recognition of the fact that "secret elections are generally the most satisfactory—indeed the preferred —method of ascertaining whether a union has majority support," [19] it indicated that bargaining orders based upon majority authorization card support would be appropriate in certain situations to remedy section 8(a)(5) violations which were accompanied by other independent unfair labor practices. *See* 395 U.S. at 610–615, 89 S.Ct. 1918, 23 L.Ed.2d 547.[20] However, the Court expressly noted that bargaining orders would *not* be appropriate in *all* such cases, and it carefully delineated the factors which the Labor Board must consider in determining whether a bargaining order should issue in a particular case.

[T]he Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and *the likelihood of their recurrence in the future.* If the Board finds that *the possibility of erasing the effects of past practices and of ensuring a fair election * * * by the use of traditional remedies,* though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue * * *.[21]

The Court emphasized that "there is still a third category of minor or less extensive unfair labor practices, which, be-

---

18. It is clear that the portions of the Board's remedial order which we herein enforce are within the area of broad remedial discretion provided it in section 10(c) of the N.L.R.A., 29 U.S.C. § 160 (c) (1970). *See* Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); Virginia Electric & Power Co. v. N.L.R.B., 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); Amalgamated Clothing Workers of America v. N.L.R.B., 125 U.S.App.D.C. 275, 281, 371 F.2d 740, 746 (1966); Office and Professional Employees International Union, Local 425 v. N.L.R.B., 136 U.S.App. D.C. 12, 19–20, 419 F.2d 314, 321–322 (1969). *See* note 13 and accompanying text, *supra.*

19. 395 U.S. at 602, 89 S.Ct. 1918, at 1934, 23 L.Ed.2d 547.

20. Although the *Gissel Packing* decision also noted that in "exceptional" cases

where there have been extremely pervasive and substantial unfair labor practice violations, a bargaining order might properly be ordered by the Labor Board even in the absence of a section 8(a)(5) refusal to bargain violation, and without need of inquiry into the question of majority status, where such a remedial order would be the only available, effective remedy (*see* 395 U.S. at 613–614, 89 S.Ct. 1918, 23 L.Ed.2d 547), the Board expressly found that the instant case did not constitute such an exceptional situation to warrant application of this particular principle. *See* Ship Shape Maintenance Co., Inc., 189 NLRB No. 58, 1971 CCH NLRB ¶ 22,-879 (1971) slip op. at 2 n. 3. *See* also note 12, *supra.*

21. 395 U.S. at 614–615, 89 S.Ct. at 1940 (emphasis supplied). *See* New Alaska Development Corp. v. N.L.R.B., 441 F.2d 491, 494 (7th Cir. 1971).

cause of their minimal impact on the election machinery, will not sustain a bargaining order." 395 U.S. at 615, 89 S.Ct. at 1940.[22]

■■ When the *Gissel Packing* standards are applied to the facts of the instant case, it becomes apparent that the Labor Board's bargaining order was improperly issued, and it must therefore be denied enforcement.[23] The violation of sections 8(a)(1) and (3) which the Company committed was not of such a substantial nature, considering all of the relevant circumstances, to warrant issuance of a bargaining order.[24]

■ We are cognizant of the fact that the Company's discriminatory transfer of all eligible voters one week before the representation election scheduled for January 9, 1970, effectively rendered the meaningful holding of *that particular election* impossible. However, this does not mean that the effects of this unfair labor practice were sufficiently pervasive and lingering to warrant a determination that a subsequent election could not be held which would be reasonably free from the adverse influence of the Company's unlawful action.

No overt anti-union animus on the part of the Company was demonstrated to any of its employees. All of them were merely informed that they were being transferred to other Company locations as a result of an apparently valid change in Company operating procedures. Furthermore, it is important to note that the record indicates no history of other anti-union behavior on the part of the Company.[25] Under these circumstances, there is clearly no reason to believe that there will be any further unfair labor practice violations by the Company in the future. We therefore conclude that "the possibility of erasing the effects of past practices and of ensuring a fair election * * * by the use of traditional remedies," which we herein enforce, is so strong as to warrant our rejection of the Labor Board's proposed bargaining order in favor of the "preferred" election process. See N.L.R.B. v. Gissel Packing Co., *supra*, 395 U.S. at 602, 614, 89 S.Ct. 1918, 23 L.Ed.2d 547. Other considerations support our determination.

It must be carefully remembered that the *Gissel Packing* decision "placed bargaining orders based on a card majority in a special category: an extraordinary remedy available to the Board to overcome the polluting effects of the employer's unfair labor practices on the electoral atmosphere. * * * It is not,

---

22. Under the principles enunciated in *Gissel Packing*, "[t]he employer's subjective motivation is [not] of controlling importance. Instead, attention must be focused on the casual relationship between the unfair practices and the election process." N.L.R.B. v. Drives, Inc., 440 F.2d 354, 364 (7th Cir. 1971), cert. denied, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1972).

23. Although we recognize that it is generally for the Labor Board, and not the reviewing courts, to make the determination of whether the circumstances of a particular case warrant issuance of a remedial bargaining order, *see* N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 612, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Franks Brothers Co. v. N.L.R.B., 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), we believe that our immediate resolution of the bargaining order issue is proper with respect to the case at bar, due to the simplicity of the factual circumstances involved and our desire to avoid further delay through needlessly protracted litigation. *See* N.L.R.B. v. Kostel Corp., 440 F.2d 347, 352 (7th Cir. 1971).

24. For the purposes of our evaluation of the appropriateness of the Labor Board's proposed bargaining order under the *Gissel Packing* rules, we assume, *arguendo*, the correctness of the Board's section 8(a) (5) determination. However, since we conclude that the factual circumstances of the instant case do not warrant enforcement of the proposed bargaining order even accepting the Board's 8(a)(5) findings, we need not—and do not—resolve that complex and controversial refusal to bargain issue. *See* note 13, *supra*.

25. Some of the other Company locations are in fact already organized.

therefore, the type of remedy which is automatically entitled to enforcement at any time after the occurrence of the unfair labor practice." N.L.R.B. v. American Cable Systems, Inc., 427 F.2d 446, 448 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). See Clark's Gamble Corp. v. N.L.R.B., 422 F.2d 845, 847 (6th Cir.), cert. denied, 400 U.S. 868, 91 S.Ct. 100, 27 L.Ed.2d 108 (1970). Although normal employee turnover in a proposed bargaining unit is not generally sufficiently ground for refusing to enforce an otherwise valid bargaining order,[26] we believe that the extraordinary rate of turnover indigenous to the Company's 500–550 building operations [27] greatly strengthens our conclusion that the adverse effects of the Company's unfair labor practice violation concerning sections 8(a)(1) and (3) should be reasonably and adequately dissipated, prior to the holding of a new representation election, through the utilization of the traditional remedies which we are enforcing, thereby obviating the necessity for resort to a bargaining order. Furthermore, the rights of the large number of employees hired subsequent to the Company's commis-

sion of the unfair labor practice violation must be considered.[28]

"[T]he purpose of a remedy must be restoration of the status quo to the greatest extent practicable; however the basic purpose of restoring the status quo is to redress the injury done to employees." Local 57, International Ladies Garment Workers Union v. N.L.R.B., 126 U.S.App. D.C. 81, 86, 374 F.2d 295, 300, cert. denied, 387 U.S. 942, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1967), and see cases cited therein. Where a remedial order has the primary effect of negating the rights of current employees rather than furthering them, it defeats, rather than effectuates,[29] the policies of the N.L.R.A. In the instant case, enforcement of the Labor Board's proposed bargaining order would impose representation upon a current unit of employees, the vast majority of whom were neither employed by the Company at the time of its unfair labor practice violation nor meaningfully affected by its commission. Such enforcement would ignore the fact that the N.L. R.A expressly protects the right of employees to *refrain from* organizational activities if they so desire.[30]

---

26. See Franks Brothers Co. v. N.L.R.B., 321 U.S. 702, 703–705, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); N.L.R.B. v. Brown Specialty Co., 436 F.2d 372, 375 (7th Cir. 1971).

27. Between January 1 and July 9 of 1970, the Company employed 149 different individuals at the 500–550 building, with the average work complement being only 35–40.

28. In some unfair labor practice cases, "[t]he interests of the employees do not necessarily parallel the union's and, therefore, should be separately considered." N. L.R.B. v. Drives, Inc., 440 F.2d 354, 366–367 (7th Cir. 1971), cert. denied, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1972). This admonition is particularly apropos to the case at bar, since the Union never represented a *substantial* majority of the employees in the 500–550 building unit, even if all 17 of the proffered authorization cards were accepted—an issue not decided—and there has been extremely

rapid post-unfair labor practice employee turnover.

29. Section 10(c) of the N.L.R.A., 29 U.S.C. § 160(c) (1970), only authorizes the Labor Board to require an unfair labor practice violator "to take such affirmative action * * * *as will effectuate the policies of [the N.L.R.A.]* * * *"* (emphasis supplied). Regarding the remedial authority of the Board, see cases cited in note 18, supra.

30. Section 7 of the Act, 29 U.S.C. § 157 (1970), provides, inter alia:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, *and shall also have the right to refrain from any or all of such activities* * * * [emphasis supplied].

We believe that the proposed bargaining order would not be remedial, but rather only punitive—*i. e.*, it would merely punish the Company for its unfair labor practice indiscretion. "It has been established, however, that the purpose of Board remedies is to rectify the harm done the injured workers, not to provide punitive measures against errant employers. '[T]he power to command affirmative action is remedial, not punitive.' Republic Steel Corp. v. NLRB, 311 U.S. 7, 12 * * * (1940)." Local 57, International Ladies Garment Workers Union v. N.L.R.B., 126 U.S.App.D.C. 81, 89, 374 F.2d 295, 303, cert. denied, 387 U.S. 942, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1967). *See* Local 60, United Brotherhood of Carpenters and Joiners of America v. N.L.R.B., 365 U.S. 651, 655, 81 S.Ct. 87, 6 L.Ed.2d 1 (1961). We are therefore unable to grant enforcement to the Labor Board's proposed bargaining order.

The remedial order of the Labor Board is hereby enforced, *except* with respect to those portions imposing a direct bargaining obligation upon the Company.[31] The case is otherwise remanded to the Board with instructions for it to schedule an appropriate representation election for the Company's 500–550 building unit on an expeditious basis.

Judgment accordingly.

WILBUR K. MILLER, Senior Circuit Judge:

I dissent from Section II of the majority opinion, and concur in Section III thereof.

---

31. Sections 1(b) and 2(c) of the Labor Board's proposed order must therefore be deleted. *See* Ship Shape Maintenance Co., Inc., 189 NLRB No. 58, 1971 CCH NLRB ¶ 22,879 (1971) slip op. at 7–10.