504 F.2d 294
 87 L.R.R.M. (BNA) 2853, 75 Lab.Cas. P 10,453
 T.I.M.E.-- DC, INC., Petitioner-Cross Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL UNION 294, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.
 Nos. 73-2531, 73-2952.
 United States Court of Appeals, Fifth Circuit.
 Nov. 15, 1974.
 
 R. Ian Hunter, Detroit, Mich., A. Read Cone, Bloomfield Hills, Mich., for T.I.M.E.
 Dominick Tocci, Albany, N.Y., for Local No. 294.
 Elliott Moore, Deputy Associate Gen. Counsel, Majorie J. Gofreed, Atty., N.L. R.B., Washington, D.C., Thomas W. Seller, Regional Director, N.L.R.B., Albany, N.Y., for N.L.R.B.
 Before BELL, GOLDBERG and CLARK, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 Kenneth Smith, a long distance truck driver employed by T.I.M.E.-- DC, Inc. (the Company), was scheduled to report for work at the Company's Albany, New York, terminal on January 17, 1972. For reasons which will appear below, Smith did not present himself in Albany until February 24, 1972. In the interim, and for several months thereafter, the Company and the Albany Local 294 of the International Brotherhood of Teamsters (Local 294) treated Smith in a manner that caused an administrative law judge to conclude on the basis of a hearing that the Company had discriminated against Smith in violation of sections 8(a) (1) and 8(a)(3) of the National Labor Relations Act (the Act)[1] and that Local 294 had prompted that discrimination in violation of sections 8(b)(1)(A) and 8(b)(2) of the Act. The National Labor Relations Board (the NLRB or the Board) adopted the decision of the administrative law judge and ordered the Company and Local 294 to atone for their discriminatory treatment of Smith. 1973, 203 NLRB No. 174. The Company has petitioned this Court for a review of the Board's order, and the Board has submitted an application to enforce its order against the Company and Local 294. An examination of the record convinces us that the NLRB's decision is supported by substantial evidence. The Board's order will be enforced.
 
 
 2
 The Company, a common carrier of freight, conducts trucking operations from terminals throughout the nation. In the summer of 1971, the Company initiated a change of operations whereby certain of its drivers were to be transferred from one terminal to another. Smith, who had worked for the Company since 1969, chose to transfer from Chicago, where he was a member of Local 710, International Brotherhood of Teamsters, to Albany. Three other Chicago drivers were to make the same move, which was to become effective on January 17, 1972. The four Chicago drivers were to have their seniority dovetailed at the Albany terminal on the basis of their full unbroken road seniority dates, as provided in the Teamsters' National Master Freight Agreement. In Smith's case, this meant that he would be fifth on the seniority list in Albany, after the three other Chicago drivers and one Albany driver but before any new Albany drivers.[2]
 
 
 3
 On December 17, 1971, while on a run back to Chicago, the door of Smith's truck suddenly closed on his hand. Smith signed off sick after returning to Chicago, and although he reported himself available for work on December 20, his hand became numb, so that Smith again signed off sick on December 22 and went home to Kirksville, Missouri, where he remained until February 23, 1972.[3] Smith made no attempt to see the Company's doctor in Chicago, as Company regulations required, but preferred to rely on the good offices of his family doctor, a chiropractor, who treated Smith and eventually released him for work. What is more important, Smith did not notify the Company that he would be unable to report to Albany as scheduled.
 
 
 4
 Two of the transferred Chicago drivers began work in Albany on January 17 and a third arrived the next day. When Smith did not appear, the Company's Albany Terminal Manager, Anthony Pape, called the Company's driver-supervisor in Chicago, Wayne Hanna, and Hanna, after consulting with another Company official, sent Smith a telegram on January 24 asking him to inform the Company of his intentions within 72 hours after receiving the telegram; Hanna warned Smith that if he did not reply, he would be dropped from the seniority list. The telegram was sent to the residence of Smith's parents in LaGrange, Illinois, an address where Smith had frequently and recently received Company correspondence. Unfortunately, Smith's father had died in December, 1971, and his mother had moved away, so that Western Union returned the telegram to the Company with the information that Smith was deceased. For some reason, this startling news did not seem to stir the Company, which took no immediate action of any sort with regard to Smith.
 
 
 5
 On January 31, the business agent of Smith's Chicago local (which had received a copy of the telegram) contacted Smith in Missouri and advised him of the Company's inquiry about his intentions. Smith immediately telephoned Hanna in Chicago and said that he had not received the telegram and that the report of his death was somewhat exaggerated. Although Smith mentioned his injury, he did not say when he planned to arrive in Albany.
 
 
 6
 By this time, the Company had hired a number of new drivers for its Albany operations, all of whom were members of Local 294 in Albany. It is at this point that the record becomes filled with conflicting testimony, for Smith's delayed arrival (and somewhat unusual behavior) created a question in the minds of the new drivers-- and in the mind of Local 294's President, Nick Robilotto-- as to Smith's seniority relative to the seniority of the new drivers. Local 294 resolved this question in favor of its own people and attempted to persuade the Company to reach a similar conclusion.
 
 
 7
 On February 17, Smith sent a telegram to Pape, the Company's man in Albany, stating that he would soon be released by his doctor and would report to Albany on February 24. After receiving this telegram, Pape told Chicago transferee Hugh Latty that Smith had a good safety record and still had a job. Smith telephoned Pape on February 22 to confirm his arrival and contends that Pape told him: 'Fine, come on up.' Pape denies this and testified that he (Pape) told Smith that there was no work for him in Albany.
 
 
 8
 At some time after February 17 and before February 24, Pape discussed Smith's pending arrival with Local 294 President Robilotto, who told Pape that since Smith had not appeared 'within the allotted time,' other (Local 294) men had taken Smith's position, so that there was nothing for Smith in Albany. Pape also talked to Richard Pastors, a Company official in Chicago, who told Pape that Smith had been discharged because he had failed to respond to the Company's telegram of January 17. Pastors sent Smith a telegram to this effect on February 22.
 
 
 9
 Nothing daunted, Smith reported for work in Albany on February 24. Pape told him (in the presence of Hugh Latty) that he had no job and 'would have to go to Local 294 to get things straightened out,' that Robilotto 'would not accept (Smith's) seniority on the Albany board' because Smith had not arrived 'in 30 days.' The next day, Smith and Latty went to the Local 294 hall, where they spoke with the Local's business agent, Bentley, as Robilotto was out. Smith told Bentley that he had been absent because of an injury incurred on the job and showed the agent his doctor's release. Bentley stated that he saw no reason why Smith could not be placed on the seniority list. When Bentley called Pape about the matter, however, Pape restated the Company's position that Smith had no job because he had not reported on January 17. Bentley then asked Pape whether he could represent Smith in a grievance concerning the purported discharge, byt Pape replied that because Smith was not a member of Local 294, the grievance would have to be filed with Smith's local in Chicago. Smith and Latty then marched over to Pape's office, where they called a Company official in Chicago who reaffirmed the Company's position with respect to Smith's discharge.
 
 
 10
 On February 28, Smith submitted his grievance concerning the discharge to a joint employer-union tribunal in Chicago. Robilotto sent a telegram to the Company on the same day advising the Company that Local 294 'could not accept (Smith) for transfer and seniority' at Albany 'due to the fact that he was to report for work at (Albany) on January 17, and he failed to do so' and had submitted no explanation for his behavior. The Joint State Committee considered this and other evidence and resolved to reinstate Smith as follows: 'Reinstate-- no compensation. Company to effect continuous coverage health, welfare, and pension by making all contributions to the funds not made because of this dispute.' Immediately thereafter, the business agent of the Chicago local advised Smith that the decision of the Committee awarded him the Albany job with full seniority.
 
 
 11
 Upon receiving the decision of the Chicago tribunal, Pape called Robilotto and told him that Smith would have to be reinstated 'pursuant to the decision.' Robilotto's first reaction was that Smith should not be reinstated; he then agreed to the reinstatement on the condition that Smith would go to the bottom of the seniority list, as the tenth man. The Company adopted this plan.
 
 
 12
 On March 3, Smith made his first trip from Albany and, upon his return, noticed that a seniority list had been posted. The first three positions on the list were held by Chicago transferees, who had been credited with their full Company seniority. Next on the list was the senior Albany driver, followed by five new men from Local 294. Smith, whose Company seniority dated to 1969, was last on the list with an Albany terminal seniority date of March 2, 1972. After reading the list, Smith attempted to contact Robilotto or Bentley at Local 294 but was unable to reach them or to have his calls returned.
 
 
 13
 On March 5, after a regular Local 294 meeting, the Company's drivers met to elect a road steward and were introduced to Robilotto, who informed them, according to Smith and another Chicago driver, that the Local 294 men came ahead of the Chicago men. After a somewhat confused election, the senior Albany man was elected steward. Smith then discussed his seniority with Robilotto, who said that he could do nothing unless Smith could establish that he had drawn workmen's compensation for the injury to his hand. Smith's Chicago lawyer sent a letter to Bentley on March 6 stating that an application for workmen's compensation had been filed, but Local 294 took no action on the matter. Smith continued to protest his seniority status, to no avail.
 
 
 14
 On March 30, during a run to Carteret, New Jersey, Smith's tractor-trailer allegedly developed transmission trouble on the New York Thruway and Smith stopped at a service area to report the trouble. A mechanic was sent from a local garage with another tractor and Smith completed his trip with the replacement tractor. When the suspect tractor was examined at the garage, however, nothing appeared to be wrong with it, and this conclusion was reported to Pape at Albany. On April 3, when Smith called the Albany dispatcher, Pape took the phone and told Smith that he had been discharged because of the events of March 30. That same day, Pape sent Smith a registered letter stating that he had been discharged for 'dishonesty,' for 'faking a breakdown' in order to collect wages for the two hours of delay. At no time was Smith asked to explain his actions.
 
 
 15
 Smith called on the Local 294 road steward on April 5 to commence a grievance procedure with respect to his discharge, but the steward declined to process the grievance, allegedly saying that the matter was 'too hot to handle' and suggesting that Smith file the grievance in Chicago. Smith was then told by the Chicago local that he could not file his grievance there, since he had been in Albany for over 30 days, but Local 294 continued to refuse to process the grievance. At this point, Smith betook himself to the local office of the NLRB, where he filed unfair labor practice charges against the Company and Local 294.
 
 
 16
 On May 6, Smith was notified that a grievance had been filed on his behalf, and at a meeting of the Albany Joint Local Grievance Committee on May 9, Smith was reinstated with back pay 'for all trips made by the next junior man to him from April 16, 1972, to May 9, 1972.' Since Smith, in the opinion of the Company and Local 294, was the most junior man at the Albany terminal, the soothing balm of vindication did not result in financial remuneration for the time he had been out of work. Shortly after returning to work on May 10, Smith once again sought an affirmation of his correct seniority status from Pape, who told him that he was still considered the most junior man because 'that was a decision from Nick Robilotto.'
 
 
 17
 After the General Counsel of the NLRB had issued a consolidated complaint against the Company and Local 294, the Company and Local 294, on their own motion, granted Smith a grievance hearing regarding his seniority status. On June 20, a Joint Local Committee, consisting of three employer representatives and three representatives of Local 294, held a hearing and decided that Smith had 'not acted responsibly' in the matter of his injury and denied his grievance. The Committee determined that Smith's 'terminal seniority'-- his seniority for purposes of determining trip seniority and layoffs -- would be established as of March 2, 1972, but that his 'Company seniority' -- his seniority for purposes of vacations, holidays, health and welfare and pensions-- would be established as of September 5, 1969.
 
 
 18
 The administrative law judge considered the events and testimony outlined above and determined that the Company had violated sections 8(a)(1) and 8(a)(3) of the Act[4] by denying Smith his rightful seniority on the Albany list and by discharging him on April 3, 1972. The administrative law judge also concluded that Local 294 had violated section 8(b)(1)(A)[5] of the Act when it refused to process Smith's grievance in April, 1972 and had violated sections 8(b)(1)(A) and 8(b)(2) of the Act[6] when it 'attempted to cause and did cause' the Company to deny Smith his rightful seniority because Smith was not a member of Local 294. Finally, the administrative law judge ruled that there was insufficient evidence to demonstrate that Local 294 had instigated the Company's wrongful discharge of Smith in April, 1972.
 
 
 19
 The Board affirmed the findings and the decision of the administrative law judge in all particulars and ordered the Company to restore Smith to his proper seniority status and to make Smith whole for any loss of wages accruing from the April 3 discharge. The Company and Local 294 were made jointly and severally liable to Smith for wages lost as a result of their denial of his seniority rights. The Company and Local 294 were also ordered to cease and desist from discriminating against Smith or any of the Company's employees at Albany because of their nonmembership in Local 294.
 
 
 20
 * We have recited the facts of this case at great length because the administrative law judge and the Board have relied heavily upon the sum of the circumstances of this case to show that the Company's treatment of Smith was instigated by Local 294 and that Local 294, in turn, was motivated by a bald, chauvinistic localism of a sort prohibited by the Act. Of course, it is not enough for the Board to demonstrate that Smith was treated incorrectly; the NLRB must prove that he was treated unfairly, that Smith was the victim of discrimination based upon his nonmembership in Local 294. It is well established in NLRB proceedings, however, that 'direct evidence of discriminatory motivation is not necessary to support a finding of discrimination,' and that 'such intent may be inferred from the record as a whole,' Health International, Inc., 1972, 196 NLRB 318, 319.
 
 
 21
 Our task in the review of an NLRB order is to determine whether there is 'substantial evidence on the record as a whole' to support the Board's decision. Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456, 469; 29 U.S.C. 160(f). This standard requires us to review all of the evidence, and not just that which supports the Board's decision. M.R. & R. Trucking Co. v. N.L.R.B., 5 Cir. 1970, 434 F.2d 689. This Court has always been mindful of its statutory duty carefully to police Board actions and we are not infrequently forced to conclude that particular NLRB findings are fatally devoid of evidentiary support. See, e.g., Amalgamated Clothing Workers of America v. N.L.R.B., 5 Cir. 1974, 491 F.2d 595; N.L.R.B. v. Carlton McLendon Furniture Co., Inc., 5 Cir. 1974, 488 F.2d 58; N.L.R.B. v. White Knight Mfg. Co., 5 Cir. 1973, 474 F.2d 1064.
 
 
 22
 Once that is said, it is usually the case that careful and critical exegesis of Board orders results in the enforcement of those orders. This situation is not completely attributable to any innate sense of justice which the Board may possess, nor is it totally the product of the NLRB's long experience and expertise in labor relations disputes, although the Board, a daily observer of union vendettas and employer alliances, is certainly better equipped to evaluate such struggles than is a Court with a sometime familiarity with those practices. The fact of the matter is that, although we may question the Board's disposition of a particular controversy, the substantial evidence standard, predicated as it is upon the Board's experience and expertise, forbids us to displace the choice of the NLRB between two fairly conflicting views even though we might justifiably have made a different choice had the case been before us as an original matter. N.L.R.B. v. United Insurance Co., 1968, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083; N.L.R.B. v. W. R. Bean & Son, Inc., 5 Cir. 1971, 450 F.2d 93, cert. denied, 409 U.S. 849, 92 S.Ct. 57, 34 L.Ed.2d 91. Moreover, we are neither empowered nor equipped to make de novo determinations of witness credibility based upon any impressions we might glean from the printed record. N.L.R.B. v. Groendyke Transport, Inc., 5 Cir. 1974, 493 F.2d 17; N.L.R.B. v. B. F. Diamond Constr. Co., 5 Cir. 1969, 410 F.2d 462, cert. denied, 396 U.S. 835, 90 S.Ct. 94, 24 L.Ed.2d 86. Where the record contains conflicting testimony, the responsibility for the resolution of such conflicts reposes exclusively in the administrative trier of fact and in the Board. N.L.R.B. v. Rex Disposables, Div. of DHJ, Inc., 5 Cir. 1974, 494 F.2d 588.
 
 II
 
 23
 This is not an easy case, in spite of the Board's assertion that the evidence here is that of a garden variety instance of union-instigated employer discrimination against a non-union employee. The parties do not agree on what was said by whom to whom; even if that problem is resolved for the sake of argument, the parties place very different interpretations upon the meaning and effect of what may have been said and done. We will examine each of the Board's conclusions in turn.
 
 
 24
 The Board determined that the Company wrongfully denied Smith his proper seniority and that this discrimination was the product of Local 294's bias against Smith because he was not a member of that union. Section 8(b)(2) of the Act makes it an unfair labor practice 'to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section.' Subsection (a)(3) makes it an unfair labor practice for an employer 'by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.' A violation of section 8(b)(2) may be found only if two elements are present: (1) an impermissible discrimination by the Union, which (2) causes or tends to result in the encouragement or discouragement of union membership. Radio Officers' Union v. N.L.R.B., 1954, 347 U.S. 17, 74 S. Ct. 323, 98 L.Ed. 455; N.L.R.B. v. International Longshoremen's Ass'n, Local 1581, 5 Cir. 1974, 489 F.2d 635.
 
 
 25
 The NLRB's disposition of this case is necessarily predicated upon the finding that Local 294, and particularly its president, Nick Robilotto, desired to deny Smith his rightful seniority in order to further the interests of the newly-hired Local 294 drivers, and that Robilotto caused the Company to effectuate this unlawful design. The evidence to support such a finding is partially circumstantial and partially based upon more direct testimony given by Smith and other Chicago transferees, testimony that was frequently contradicted by various Company and Local 294 officials. We believe that the administrative law judge's decision to credit Smith's rendition of the disputed events was not unreasonable. We find that Smith's testimony, in the context of all the surrounding circumstances, adequately supports the NLRB's inference that the Company and Local 294 unlawfully discriminated against Smith.
 
 
 26
 The Company and Local 294 argue that even if the Company's actions were the product of union pressure, their respective actions with respect to Smith were not based upon any discriminatory motive but were instead the natural results of a reasonable (and at worst an incorrect) interpretation of the Company-Local 294 agreements regarding seniority. The Board considered this interpretation of the facts and found it unpersuasive, and we have already shown that we may not reject the Board's view of the matter if it is grounded upon substantial evidence, no matter what other gloss might be put upon the same statements and events.
 
 
 27
 The Company and Local 294 contend that it was reasonable for them to believe that Smith's failure to report to Albany on January 17, 1972, rendered him liable to discharge and that he was in fact discharged, so that his seniority could date only from the day on which he was 'rehired' and returned to work -- March 3, 1972. They rely on the language of article 5, section 1 of the Teamsters' National Master Freight Agreement, a part of the collective bargaining agreement between the Company and Local 294, which reads as follows:
 
 
 28
 Seniority rights for employees shall prevail under this agreement and all agreements supplemental thereto. Seniority shall only be broken by discharge, voluntary quit, more than a three (3) year layoff . . . or as provided in any applicable provisions of the supplemental agreements. The extent to which seniority shall be applied as well as the method and procedures of such application shall be clearly set forth in each of the supplemental agreements.
 
 
 29
 This language must be read in conjunction with the Change of Operations Agreement which governed the transfer of drivers from Chicago to Albany. This Agreement directed that 'drivers who relocate shall have their seniority dovetailed at their new terminals on the basis of their respective full unbroken road seniority dates.'[7] Finally, article 43, section 5 of the supplemental agreement between the Company and Local 294 provides that 'terminal seniority as measured by length of service at such terminal shall prevail excepting in those instances where the employer, the unions involved and the New York State Teamsters Joint Freight Division agree to the contrary.' The Company and Local 294 argue that since article 43 is a part of the supplemental agreement to the Master Freight Agreement, and since Smith failed to conform to the provisions of the Change of Operations Agreement by failing to report as scheduled, article 43 formed a sound basis for a reasonable belief that Smith's terminal seniority should date from March 3, 1972. They argue further that this interpretation was so reasonable tha the Albany Joint Grievance Committee adopted the very same conclusion in its decision of June 20, 1972.
 
 
 30
 Even assuming that we should take any cognizance of the Albany Committee's decision, the persuasiveness of this argument lasts only as long as one neglects to read the rest of the Master Freight Agreement. Article 46, section 1(c) provides that 'where a Joint State Committee by a majority vote settles a dispute, no appeal may be taken. Such a decision will be final and binding on both parties.' If the Company and Local 294 could have entertained a good faith misapprehension of Smith's seniority prior to the Illinois Joint State Committee's decision of February 28, 1972, wherein that Committee reinstated Smith, any legitimate confusion must have been banished upon receipt of that decision. Although the order of reinstatement: 'Reinstate-- no compensation. Company to effect continuous coverage health, welfare, and pension by making all contributions to the funds not made because of this dispute'-- is not a model of pellucidity with respect to seniority, the order clearly reinstated Smith, so that any possible discharge was thereby rendered void, and with it any possible loss of seniority rights was obviated. This is not a subtle point of contractual interpretation, the knowledge of which could not be fairly charged to Company terminal managers and union leaders; by reinstating Smith, the February 28 decision necessarily indicated that there was no possible reason for which his accrued seniority rights could be nullified pursuant to article 5, section 1 of the Master Freight Agreement. The administrative law judge found, furthermore, and the Board agreed, that 'the reasonable import of (the language of the February 28 order) not only restored Smith to his job but also reestablished all rights appurtenant to that job, including seniority. Indeed (Smith's Chicago local) interpreted that decision to mean that it reinstated Smith with full seniority.' Although it would not be correct to say that the Company and Local 294 are chargeable with the acquired expertise of an administrative law judge or with the particular knowledge and experience of another local, such interpretations do tend to indicate the unreasonableness of a belief that the Illinois Joint State Grievance Committee would deny by silence those precious seniority rights which article 5, section 1 of the Master Freight Agreement tells us may be forfeited only in specified circumstances.
 
 
 31
 The Company and Local 294 also urge that the NLRB erred in failing to defer to the decision of the Albany Joint State Committee, dated June 20, 1972, regarding Smith's seniority rights. In Spielberg Mfg. Co., 1955, 112 NLRB No. 139, the Board established a policy that where certain minimum standards are met-- where 'the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act,' 112 NLRB at 1082-- the Board will defer to the decisions of an arbitrator or a bipartisan committee with respect to the same subject matter as the arbitrated grievance. See Carey v. Westinghouse Elec. Corp., 1964, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320. In Collyer Insulated Wire, 1971,192 NLRB No. 150, the Board extended its Spielberg policy to cases where there is reasonable cause to believe that the use of the arbitral or grievance machinery by the parties will resolve the issue in a manner compatible with the Act. See National Radio Co., Inc., 1972, 198 NLRB No. 1. Spielberg and Collyer represent a part of the NLRB's continuing effort to facilitate the prompt and expert settlement of labor disputes in a peaceful manner by the parties involved, without resort to the sometimes ponderous apparatus of federal intervention.
 
 
 32
 Spielberg and Collyer can have no application, however, to a situation where the arbitration or grievance proceedings are not even-handed, for in such a case there can be no expectation of fairness and substantial justice such as to be minimally satisfactory to all parties. Where both the employer and the union are hostile to an employee's interests, the Board has properly refused to defer to an arbitral or grievance procedure invoked and administered by the employer and the union. Anaconda Wire & Cable Co., 1973, 201 NLRB No. 125; Kansas Meat Packers, 1972, 198 NLRB No. 2. In this case, where the Board has found that the Company and Local 294 have committed unfair labor practices against Smith over a period of several months, any deference to the decision of a tribunal composed, as the Albany Committee was, of representatives of the Company and Local 294 would surely be misplaced. Even assuming that the decision of the Albany Committee was not a nullity, in light of the previous decision of the Illinois Committee and the directive of section 46 of the Master Freight Agreement that the previous award would be final and binding on all parties, the Board did not err in refusing to accord any weight to the decision of the Albany Committee.
 
 
 33
 The administrative law judge found, and the Board agreed, that the Company violated sections 8(a)(1) and 8(a)(3) of the Act by discharging Smith on April 3, 1972, but that there was insufficient evidence to implicate Local 294 in the matter. This conclusion is certainly supported by substantial evidence. The abruptness of the discharge, coupled with the total failure of the Company to conduct a fair and impartial investigation and the previous history of the Company's treatment of Smith, indicate that the discharge was pretextual in nature and that the charge of 'dishonesty' was only a mask for a discriminatory motive. See N.L.R.B. v. Ship Shape Maintenance Co., Inc., 1972, 154 U.S.App.D.C. 186, 474 F.2d 434; N.L.R.B. v. Montgomery Ward & Co., Inc., 2 Cir. 1957, 242 F.2d 497, cert. denied, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41. After a consideration of all the surrounding circumstances described above, we also hold that substantial evidence supports the Board's finding that Local 294 violated section 8(b)(1)(A) of the Act when it refused to process Smith's grievance regarding his April 3 discharge.
 
 
 34
 In summary, the record as a whole is the sum of its parts and while parts of the Board's case against the Company and Local 294 evidence some stress, the entire record demonstrates such tensility as to convince us of the structural soundness of the Board's decision that Smith was the victim of a primitive sort of union localism, a localism which the Company helped to effectuate. The petition for review is denied. The Board's order will be enforced.
 
 
 35
 Enforced.
 
 
 
 [1]
 29 U.S.C. 151-168
 
 
 [2]
 Seniority is an especially important consideration for truck drivers because assignments are made on the basis of seniority. If a senior man returns from a trip before a junior man's name comes up on the assignment list, the senior man will have the option of making the next available trip even though the junior man has had no assignments at all
 
 
 [3]
 Smith made a one-day trip to Chicago on December 28 on an unrelated matter
 
 
 [4]
 29 U.S.C. 158(a) provides in pertinent part:
 It shall be an unfair labor practice for an employer-- (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 . . . .e a
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .
 
 
 [5]
 29 U.S.C. 158(b)(1) provides:
 It shall be an unfair labor practice for a labor organization or its agents-- to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title . . .
 
 
 [6]
 29 U.S.C. 158(b)(2) provides:
 It shall be an unfair labor practice for a labor organization or its agents-- to cause or attempt to cause an employer to discriminate against an employee (on the basis of his membership or nonmembership in any labor organization) . . .
 
 
 [7]
 This provision is hardly boilerplate. bargaining representative ordinarily has the right to give an inferior seniority ranking to employees transferred from another unit. Ford Motor Co. v. Huffman, 1952, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048; Schick v. N.L.R.B., 7 Cir. 1969, 409 F.2d 395