PEOPLES GAS SYSTEM, INC.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Teamsters Local Union No. 769, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenors.

No. 78-2330.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 21, 1980.

Decided May 2, 1980.

E. John Dinkel, III, Tampa, Fla., for petitioner.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., with whom John S. Irving, General Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Morton Namrow, Atty., N. L. R. B., Washington, D. C., were on brief, for respondent.

William T. Coleman, Jr., Washington, D. C., for intervenors.

Before ROBB, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge, WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge ROBB.

WALD, Circuit Judge:

■ This refusal-to-bargain case has had an unfortunately long and complicated history, ranging back over seven years. At this point, our decision must come to grips with two issues, the same two issues in dispute when an administrative law judge first considered the case many years ago: whether the employer Peoples Gas Company committed an unfair labor practice in 1973 when it withdrew recognition from the Teamsters' Local Union 769 and refused to bargain with it as the representative of the Peoples Gas employees,[1] and, if so, whether a bargaining order is an appropriate remedy. The National Labor Relations Board's choice of a bargaining order to remedy the unfair labor practice may only be reversed if it was an abuse of the Board's discretion in light of the unusual circumstances of the case.[2] We conclude that the Board's finding that Peoples Gas improperly withdrew recognition from the Union is supported by substantial evidence and thus we grant enforcement of the Board's usual remedies of a cease and desist order and posting of an appropriate notice, but conclude that the remedy of a bargaining order is not warranted in this case.

■ In order to put our discussion of the facts into a proper context, we first note the basic tenets of unfair labor practice law as they relate to withdrawal of recognition from an incumbent Union and subsequent refusal to bargain. As a general matter, an employer is under no obligation to bargain with a Union which does not represent a majority of its employees.[3] Furthermore, a Company need not bargain with a Union which demands recognition until the Union can prove through a Board-conducted election that it in fact is supported by a majority of the employees. *Linden Lumber Division v. NLRB*, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974). However, once a Union wins the election and is certified by the Board as the representative of the employees, the Union en-

---

1. Our review of this determination is limited to assuring that the National Labor Relations Board's findings are supported by substantial evidence. 29 U.S.C. § 160(e) (1976).

2. The Board's choice of remedies will not be disturbed "in the absence of a clear abuse of discretion." *United Steelworkers of America v. NLRB*, 376 F.2d 770, 773 (D.C.Cir.), *cert. denied*, 389 U.S. 932, 88 S.Ct. 297, 19 L.Ed.2d 285 (1967).

3. Indeed, bargaining with a Union which does not represent a majority of employees is an unfair labor practice, unless the Company is ordered to do so by the Board, since it constitutes Company support for a Union in violation of section 8(a)(2) of the National Labor Relations Act, 29 U.S.C. § 158(a)(2); *NLRB v. Book*, 532 F.2d 877 (2d Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976).

joys a continuing presumption of majority support. That presumption is irrebuttable for a year following the election in order to provide time for the bargaining relationship to become established and begin providing results; thereafter the Company may properly withdraw recognition from the Union and refuse to bargain further with it if the Company has a reasonable basis in fact to doubt the incumbent Union's continuing majority status. *Allied Industrial Wkrs., AFL–CIO Loc. U. No. 289 v. NLRB*, 476 F.2d 868, 881 (D.C.1973). The Company may not, of course, destroy a Union's majority through unfair labor practices and then justify its refusal to bargain on the grounds that the Union no longer represents a majority, *Medo Photo S. Corp. v. NLRB*, 321 U.S. 678, 687, 64 S.Ct. 830, 834, 88 L.Ed. 1007 (1944); the Company's doubt of majority status must be asserted in good faith.

With these considerations in mind, we turn to the history of this labor dispute as found by the Board.

## I. THE FACTS SURROUNDING THE UNFAIR LABOR PRACTICE

The Company is a Florida utility which sells and distributes natural gas and liquid petroleum products. In 1966, following an election, the Union was certified by the Board to represent the Company's Miami-area production, maintenance and distribution employees. Two successive three-year contracts were negotiated between the parties, though the second contract was only signed after an unsuccessful strike in 1970 during which 40 percent of the strikers, 54 of the 117 employees, were permanently replaced. Two and a half years later, the Company acquired a nearby competitor, adding 25 employees to the bargaining unit, none of whom ever submitted a union dues check-off card to the Company.

In February, 1973, the second of the contracts was due to expire. Negotiations did not go well; even after numerous collective bargaining sessions, the parties were unable to agree to a final contract. During the sessions leading up to the February 6 expiration date, the Union repeatedly asserted that a strike would be called if no agreement was reached. At the last bargaining session prior to the expiration of the contract, no progress was made and many issues were unresolved. Nevertheless, the Union agreed to take the Company's last offer to the employees, while at the same time asserting that it would recommend against acceptance of the contract, and call for a strike.

By the time of the meeting, however, the Union negotiators changed their minds, recommended acceptance, and the employees approved the proposals. The next morning, the Union contacted the Company and asked if an agreement could be drafted by the parties. The Company's attorney responded that a complete contract had not yet been agreed upon, since many bargaining areas were yet to be resolved, and a February 14 meeting was set to try to reconcile the differences. We note that up to this point, there is no dispute over the fact that the Company had dealt with the Union without hostility and entirely within the requirements of the law. At the February 14 meeting, it soon became clear that while the Union insisted it had a contract, the Company felt there were many unresolved areas to be negotiated. The Union cut off negotiations, insisting it would "go the legal route," but now taking the position that no strike would be called.

No further negotiations occurred. The Union did file an unfair labor practice charge with the Board, contending that the Company had bargained in bad faith by refusing to sign a contract, but later withdrew the allegation. Two weeks later, the Union began the behavior which, the Company asserts, convinced it that the Union had lost its majority support and was grasping for any signed contract, however unfavorable to the employees, which would serve to bar a decertification petition.[4] The

4. The contract-bar principle is important to an understanding of this case. Briefly, the Board

has long adhered to a policy of refusing to direct an election among employees in a bar-

Union first pressed the Company's attorney for a draft copy of a final contract in the Company's terms, saying that it would consider signing it. On April 10, the Union filed another unfair labor practice charge, alleging that the Company had repudiated an agreed-upon contract, which it asserted was complete and final at the time of the employee vote. Finally, the Union requested a version of a contract acceptable to the Company, assuring the Company that it would sign any such contract.

Its suspicions aroused, the Company stalled, and began an investigation into the composition of the bargaining unit and its strength. The Company's attorney discovered that while just before the 1970 strike 76 percent of the employees had authorized the Company to check off their Union dues, that indicia of Union support had dwindled to just 39 percent. Furthermore, none of the new employees from the acquired company had submitted a dues check-off card. Finally, the attorney was told that in the preceding year, the Company had experienced a 36 percent turnover rate among its employees.

Putting this information together with what it regarded as the odd bargaining behavior of the Union, the Company concluded that it could properly test the Union's majority. It therefore filed a representation election petition with the Board on April 23, 1973.[5] The Company also notified the Union that it would not sign a contract, and would not bargain further

with the Union in light of the petition it had filed.

Early in May, the Union wrote to the Company's attorney, protesting that the Company's refusal to bargain violated section 8(a)(5) and that the Union stood "ready, willing and able to demonstrate . . . [its] majority status pursuant to current Board law." The Union then amended the charge it had filed with the Board, alleging that the Company was refusing to bargain with it as the certified representative of the unit employees.[6]

## II. THE ADMINISTRATIVE AND JUDICIAL PROCEEDINGS

The borderline nature of the violation involved in this case is demonstrated by inconsistent results as the case worked its way through the administrative process. Initially the Regional Director refused to issue a complaint, concluding that the Company had an adequate objective factual basis for its doubt of the Union's continuing majority status. That determination was reversed by the Office of General Counsel, which found that sufficient question existed concerning the propriety of the Company's conduct to warrant the issuance of a complaint and further investigation.[7] After a hearing, an Administrative Law Judge concluded that, on balance, the factors relied on by the Company were insufficient to justify a refusal to bargain, given the heavy burden placed on an employer to justify refusing to bargain with a Union certified as the representative of the employees.

gaining unit which is covered by a valid collective bargaining agreement. The bar is now limited to three years, however. The doctrine is an attempt to balance the interest of employees and society in stability and adherence to negotiated agreements, with the sometimes conflicting desire of employees to select and change their representative. See the Board decision in *General Cable Corp.*, 139 NLRB 1123 (1962), which established the present three year limit to the duration of the bar.

5. It is not clear from the record, but we assume that this petition was dismissed in accordance with the Board's usual practice because of the pending unfair labor practice charge. Such charges normally block any election until they are disposed of by the Board.

6. Section 8(a)(5), 29 U.S.C. § 158(a)(5) (1976) provides, *inter alia*: "It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees . . . ."

7. The Regional Director had also refused to issue a complaint with regard to the Union's first charge, that the Company had repudiated a contract which had become final when the employees voted to accept the Company's offer. He determined that in fact, too many important contractual issues remained unresolved to conclude that a final contract existed at any time. His refusal to issue a complaint on this charge was upheld by the Office of General Counsel.

The case reached the Board for the first time in November, 1974. The Board disagreed with the Administrative Law Judge, concluding that the declining trend in check-offs, the high turnover among the employees, and the conduct of the Union during negotiations constituted sufficient objective evidence to support the Company's asserted good faith doubt. The complaint was therefore dismissed in its entirety.

Although the Union took an appeal to this court, it also filed a petition for a representation election with the Board, presumably to avoid, if possible, the inevitable delay attendant on further litigation and to resume a bargaining relationship as soon as possible. An election was held in May, 1975, and the Union lost by a decisive margin.[8] No objections to the election were filed, and the results were thereafter certified by the Board.

Meanwhile, the Union's appeal from the Board's dismissal of the complaint was still pending before this court. Although the Company moved for dismissal of the appeal as moot in light of the results of the election, this court reached the merits of the case a year later in May, 1976, concluding that "[a]t least at this stage of the proceedings, we are not prepared to say that were the Board's decision to be reversed, the Board would be powerless to mandate a new election or even to issue a bargaining order." *Teamsters Local U. 769 v. NLRB*, 532 F.2d 1385, 1388 (D.C.Cir.1976).

**8.** Normally, as pointed out *supra*, note 5, an election will not be directed if an unfair labor practice charge is pending. In accordance with this practice, the Regional Director initially notified the parties that the requested election would be held in abeyance pending the final disposition of the 8(a)(5) proceeding. The Union appealed that ruling, and the Board reversed, ordering the Regional Director to proceed with the election. The Union lost, 93 to 61, attracting less than 40 percent of the vote.

**9.** In the so-called "right-to-work" states, employment may not be conditioned on Union membership, and generally employees may not be forced to support financially the Union that represents them. Section 12 of the Florida Constitution provides:

The court went on to hold, Judge Tamm dissenting, that the Board had not sufficiently explained its conclusion that the Company had not committed an unfair labor practice by withdrawing recognition from the Union and refusing to bargain any further with it. The opinion noted several apparent inconsistencies in the Board's opinion, and concluded that, at the very least, it was incumbent on the Board to explain those inconsistencies and why its conclusions in this case seemed to differ from those in earlier cases.

First, the court questioned the Board's permitting the employer to rely on the decline in check-off authorizations to support an inference of declining majority support. Dues check-off is not a reliable indicator of lack of Union support in a right-to-work state like Florida.[9] Furthermore, if probationary workers who were not permitted to submit check-off cards were discounted, the Company actually held authorization cards from a majority (51 percent) of workers. Normally, the assumption is that probationary workers will support an incumbent Union in the same proportions as the established work force, and the Board had failed to explain why it felt the normal presumptions should not operate in this case. Next, the court criticized the Board's acceptance of a high turnover rate as evidence of lack of majority support, since high turnover *alone* had not in the past been accepted as evidence of loss of Union support, the presumption being, again, that new workers would continue to support the Union as did the old workers.

The right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union, or labor organization; provided, that this clause shall not be construed to deny or abridge the right of employees by and through a labor organization or labor union to bargain collectively with their employer. In a right-to-work state, if a large percentage of workers are on check-off, it is convincing evidence of majority support, since the workers are voluntarily assuming the burden of financial support for the union. A low percentage, on the other hand, does not necessarily indicate a lack of support, since a worker who is unwilling to pay for a union may still desire its representation.

Finally, the court acknowledged that the Union's "strange" behavior during negotiations might be relevant, but concluded that the Board had failed to adequately explain the implications it drew from that behavior. The court also noted the Board's uncritical acceptance of hearsay testimony upon which the Administrative Law Judge had placed little emphasis, and its failure to distinguish earlier opinions which had concluded both that failure to submit check-off cards does not necessarily mean the employees oppose representation by the Union, and that events occurring after the refusal to bargain cannot form a basis for finding that the employer had a good faith doubt of the Union's majority status. The cumulation of these failures to explain, the court concluded, required reversal of the Board decision, and remand to the Board for further proceedings.

Two years and four months later, the Board issued its supplemental opinion in this case, completely reversing its earlier stand, and concluding that in fact the Company did not have sufficient objective evidence of lack of Union support to justify withdrawal of recognition. The Board discredited the low percentage of check-off cards and high turnover, noting that the two indicators in fact are interdependent [10] and that the normal presumption is that new employees will continue to support the Union in the same proportions as do established personnel. The "odd" bargaining behavior of the Union was considered to be too ambiguous to supply the necessary objective evidence of lack of majority support; strike threats, the Board noted, are often made with no intention of carrying out the threat, and the Union's "capitulation" and eagerness to sign any contract, while suspicious, raised implications which were essentially subjective rather than objective. Thus, none of these factors, alone or taken as a whole, were sufficient to overcome the presumption of continuing majority status enjoyed by a certified incumbent Union, and the Company had committed an unfair labor practice when it withdrew recognition from the Union and refused to bargain with it.

The Board then turned to the question of the proper remedy for the violation it had found. It noted that the Administrative Law Judge, in his original recommended order, had suggested that a bargaining order would be an appropriate remedy. The Board went on: "Such a bargaining order is obviously appropriate, and, we would say, necessary to remedy effectively the unlawful conduct and to return the situation to what it was prior to the unlawful withdrawal of recognition."

In light of the intervening election, the Board recognized that issuance of a bargaining order might arguably conflict with its policy, as expressed in *Irving Air Chute Co.*, 149 NLRB 627 (1964), to the effect that a bargaining order would only issue after an election lost by a Union if the Union had filed meritorious objections and the election had been set aside. The Board distinguished the *Irving Air Chute* policy on two grounds; first, *Irving Air Chute* dealt with a situation in which a Union is seeking initial recognition, rather than seeking to recapture recognition wrongfully withheld from it, and second, the filing of objections to the election based on a refusal to bargain in this case would have been futile, since at the time the election was held, the Board had concluded the withdrawal of recognition was justified and lawful.[11]

---

**10.** Since probationary workers could not be on check-off under the Company rules, and since a high turnover would result in a large percentage of workers on probation, the "two" indicators are in fact only one. However, unless the Company had experienced a dramatically increased rate of employee turnover (which is not clear from the record though it is possible because of the strike and the acquisition of its competitor), high turnover would not explain the decline in percentage of employee check-off cards.

**11.** A three-member panel of the Board decided this case, and the decision was split. Member Panello dissented, arguing both that the Board's prior decision which found no violation was correct, if inadequately explained, and that a bargaining order was improper in a case in which a fair Board election had been conducted, without objection from the Union, after the

The Company filed a timely petition for review of the Board's order, and the Board has cross-petitioned for enforcement of its order.

## III. THE STANDARD OF REVIEW

It is worth briefly noting the standard of review to which we are bound in considering these petitions. The Board's finding of an unfair labor practice must be upheld if it is based upon substantial evidence on the record, and on reasonable inferences drawn from the facts as found. Furthermore, the remedy chosen by the Board must "be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547 (1969). It is the Board which is charged with the responsibility for ensuring that the Act's underlying goal of industrial peace through employee free choice is achieved,[12] a responsibility which it could not discharge if it did not receive our respect for its judgment. Section 10(c) of the Act expressly provides the Board with the statutory authority "to take such affirmative action . . . as will effectuate the policies of this [act]," policies which are some-times conflicting and which require the exercise of discretion and informed judgment to balance.

■ Nevertheless, this court is a reviewing court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act. As the Supreme Court has made clear:

> Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions. Of course due deference is to be rendered to agency determinations of fact, so long as there is substantial evidence to be found in the

---

alleged unfair labor practices had occurred. Chairman Fanning would have entered a bargaining order retroactive to the date of the first refusal to bargain, while Member Murphy, under the circumstances of the case, felt that a prospective bargaining order was appropriate.

12. The congressional declaration of purpose in section 1 of the Act, 29 U.S.C. § 141(b), provides:

(b) Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

It is the purpose and policy of this chapter, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.

Section 7 originally protected only the right to unionize but was amended when the Taft-Hartley Act was passed in 1947 to expressly protect employees' right *not* to engage in collective activity. It provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.

record as a whole. But where, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress."

*NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). With these considerations in mind we turn to our explanation of our conclusions in this case.

## IV. THE REFUSAL TO BARGAIN

For many years, the Board has judged the legality of an employer's withdrawal of recognition from an incumbent Union [13] by making a case-by-case determination whether the employer's asserted doubt as to the Union's majority status is in good faith and is supported by substantial objective evidence.

The problem with this case-by-case approach is that both the employer and the Union are subject to the shifting views of the members of the Board and the courts as to what evidence is sufficiently "objective" and convincing to demonstrate a good faith doubt.[14] The Board and the courts struggled for many years with an identical standard governing the initial duty to bargain with a Union claiming majority status through authorization cards. An employer could only refuse to bargain with a Union and insist on an election if it had a "good faith doubt" of the Union's majority. *Joy Silk Mills, Inc.*, 85 NLRB 1263 (1949), *enf'd*, 185 F.2d 732 (1950). This standard embroiled both the Board and the courts in countless disputes over an employer's intent and state of mind when in fact, the employer's state of mind should be irrelevant. If the Union represented a majority there should be bargaining; if it did not, there should not be bargaining. Therefore, it made far more sense to rely on an efficient and speedy method of ascertaining actual employee wishes than to permit lengthy and ambiguous disputes over employer intent and good faith. The approach was gradually eroded; "virtually abandoned" by the time *NLRB v. Gissel Packing Co*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) was decided; and finally laid to rest with the decision in *Linden Lumber Division v. NLRB*, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974).[15] Now, so long as it

---

**13.** For ease of reference, we will call these "withdrawal of recognition" cases henceforth. The phrase will refer to cases involving an employer refusing to bargain with an incumbent Union, after the passage of the certification year, based upon an asserted good faith doubt that the Union still enjoys majority support among the employees in the bargaining unit.

**14.** Compare the Board's results in this case with those in *Viking Lithographers, Inc.*, 184 NLRB 139 (1970), in which the complaint was dismissed by the Board, even though the only additional "objective fact" indicating loss of support appears to have been that "several employees expressed to management dissatisfaction with the Union." Also contrast *Upper Mississippi Towing Corp.*, 246 NLRB 41 (1979) (no violation) with *Harvey's Wagon Wheel, Inc.*, 236 NLRB 1670 (1978) (violation found). A standard under which such small factual differences are decisive seems questionable when an ultimate finding of an unfair labor practice and a resultant bargaining order have such important consequences for the employees' section 7 rights.

**15.** The Board's decision in *Linden Lumber Div.*, 190 NLRB 718 (1971), which was ultimately affirmed by the Supreme Court, and which rejected the "good faith doubt" test in the pre-election context, notes considerations which seem to us to be relevant in withdrawal of recognition cases as well. The Board pointed out:

The facts of the present case have caused us to reassess the wisdom of attempting to divine, in retrospect, the state of employer (a) knowledge and (b) intent at the time he refuses to accede to a union demand for recognition. . . . [H]ow are we to evaluate whether it "knows" or whether it "doubts" majority status? And if we are to let our decisions turn on an employer's "willingness" to have majority status determined by an election, how are we to judge "willingness" if the record is silent, as in *Wilder*, or doubtful, as here, as to just how "willing" the Respondent is in fact? We decline, in summary, to reenter the "good-faith" thicket of *Joy Silk*, which we announced to the Supreme Court in *Gissel* we had "virtually abandoned . . . altogether."

refrains from independent unfair labor practices, an employer need not bargain with a Union until the Union proves its majority in an election.

We recognize that a withdrawal of recognition, terminating an established bargaining relationship, requires closer attention to the goals of industrial peace and stable bargaining relationships. The danger of permitting an employer to disrupt bargaining and continuously challenge a Union's majority, diverting its attention and resources from representing the workers to defending itself, requires a different standard from the one which governs initial recognition. Obviously, an automatic right to insist on an election, the procedure approved in *Linden Lumber* for initial recognition cases, would not be appropriate in withdrawal of recognition cases. Nevertheless, a clearcut, objective standard governing the conditions under which an employer will be permitted to challenge a Union's status would seem preferable to the present procedures and standards which leave both the Company and the Union in the dark as to when a challenge can be made, often require years to resolve, and run a substantial risk of frustrating actual employee wishes simply because the Board is not satisfied with the Company's ability to identify and articulate the reasons for its doubt about the Union's support.

■ In the meantime, however, we must grapple with the standard which the Board now applies. We have considerable hesitancy about the Board's reversal of position in this case, and regard it as a very close case. The standard is, after all, only a good faith *doubt*; proof is not required. It is difficult to accept the notion that objective evidence which was considered sufficient by both the Regional Director and the Board to support a good faith doubt in 1974 was no longer sufficient in 1978; indeed, this case is a good example of the problems with the vagueness of the standard as a whole. However, we conclude that given the facts surrounding the withdrawal of recognition, the Board was justified in deciding that the employer had insufficient evidence to over-

come the presumption of continuing majority support enjoyed by the the Union. A decline in Union dues check-off authorizations in a right-to-work state seems to lend very little affirmative support to a doubt of majority status. While such a decline is *consistent* with a corresponding decline in support there are too many other possible explanations for a worker who does not have to pay dues preferring not to, even if the worker still favored Union representation. Such a decline is therefore not a reliable indicator of Union support. Much the same is true of high employee turnover, and the Union has the added advantage of a presumption, unless there is some concrete evidence to the contrary, that new employees will support the Union in the same proportions as the established workforce. The Company does not point to any indications of employee unrest or dissatisfaction with the Union which might serve to cast both the decline in check-off cards and the high employee turnover in a different light; absent such additional factors, these conditions are innocuous and lend no support to the Company's doubt.

■ Thus we are left with the Union's "odd" behavior during bargaining, and we must agree that the Board has taken a reasonable course in concluding that this sort of bargaining behavior, even when combined with high employee turnover and a decline in check-off cards, is not a clear enough indication that the Union is in serious trouble with the employees to permit the company to terminate bargaining and disrupt an established relationship. In the heat of collective bargaining, tactics are sometimes employed which many might regard as bizarre, and may include deliberate attempts to mislead and confuse the opponent. Permitting what is essentially a subjective and speculative interpretation of the probable meaning of particular behavior to suffice as "objective" indicia of lack of majority support would give too little weight to industrial stability, and would result in repeated disruption of collective bargaining at its most critical point, during the negotiation of new contracts.

We therefore find support in the record for the Board's decision that the Company committed an unfair labor practice when it withdrew recognition from the Union and refused to bargain further. The fact that the Company apparently did so in good faith, of course, does not affect the finding of an unfair labor practice; under the Board's present standards, good faith is a necessary but not sufficient element of a decision to withdraw recognition. We affirm the Board's finding that the other crucial element, substantial objective indicia of loss of Union support among the workers, was lacking here. We will therefore enforce a cease and desist order and a requirement of posting of appropriate notices. We will not, however, grant enforcement of the Board's proposed bargaining order, as explained more fully below.

## V. THE PROPRIETY OF THE BOARD'S BARGAINING ORDERS

We must conclude that the Board's choice of a bargaining order as a remedy for the employer's violation in this case cannot be upheld as a justified exercise of its discretion. The Board's opinion evidences little or no consideration of the competing interests at stake when a bargaining order is issued in a case with a history like this one. One of the fundamental rights under the Act which the Board is charged with protecting is employees' right to choose their bargaining representative, as well as the "right to refrain" from collective bargaining.[16] Those rights are unjustifiably compromised by the remedy chosen here.[17] We would be far more receptive to the Board's request for enforcement had its decision reflected any balancing of the competing considerations which surface so dramatically on this record; a balancing which is an essential component of any valid exercise of discretion. The scope of the Board's choice of remedies is limited to those which will "effectuate the policies of this act." We are unable to discern from the Board's opinion how a bargaining order in this case would do so.

A. *Necessity for a Reasoned Elaboration by the Board.* Before the Board is entitled to the considerable respect and deference with which we normally approach any review of its choice of remedy, its orders must reflect a responsible exercise of discretion and clearly articulate the basis for its decision. A remedial order should recognize the competing considerations which are potentially affected by the remedy chosen, be grounded in factual determinations rather than speculation, and explain how, in light of present circumstances[18] its remedy can be expected to effectuate the purposes of the Act.

---

**16.** See note 12, *supra.*

**17.** Not only would the employees be forced to accept the Union as their bargaining representative now, but they would perhaps be unable to exercise their right to choose a representative for many years hence. After a bargaining order is entered, there is a "reasonable period," similar to the year after a Union is initially certified, during which no decertification petition will be considered. *See, e. g., Hermet, Inc.,* 207 NLRB 671 (1973); *Mercy-Memorial Hospital Corp.,* 221 NLRB 1 (1975). Then, if a contract is signed, which seems likely to occur in the course of a year of bargaining, the three-year contract bar would stymie any attempt by the employees to choose another Union or decertify the present Union, unless the Board were to provide for an exception to its normal rules.

**18.** We think it clear that no responsible decision-making body can formulate a reasonable remedy without taking into account conditions at the time its order is entered, though there seems to be some dispute among the circuits whether the Board must do so. The rationale of those cases which conclude that the Board need not consider events which occur after an alleged violation is that if employer misconduct is to be deterred, the remedy should not reflect later events, but be tailored simply to restore the "status quo" at the time the unfair labor practice occurred. Otherwise, it is argued, a premium is put on continued delay by the employer in the hope of "a new set of facts, as to which the Board must then readjudicate." *NLRB v. L. B. Foster Co.,* 418 F.2d 1 (9th Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970).

We are unable to approve an approach which mechanically places deterrence above employee free choice on the scale of values under the Act. Taking subsequent events into account does not mean that employer delay must be

■ These general principles are particularly important in cases like this one, involving bargaining orders issued where there is a substantial possibility that in fact the employees do not desire representation by the Union. There are two situations [19] in which the dilemma frequently arises; when a Company refuses to accept a Union's offer of authorization cards as evidence of its majority, and then commits unfair labor practices during the election campaign, see *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); [20] and when, as in this case, a Company refuses to bargain with an incumbent Union, asserting a good faith doubt of Union majority support.[21] In such cases, before we will enforce a bargaining order, we must be able to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive to employees' rights, are not adequate.

■ In its opinion in this case, the Board seems to regard a bargaining order as the automatic and "clearly appropriate" remedy for refusal to bargain.[22] This

rewarded. All we require is that the remedy best suited to the purposes of the Act, which include both deterrence of employer misconduct and protection of employee free choice, be selected in light of reality. What is required is an *exercise of discretion*, with all the careful judgment and balancing of competing considerations implied by the phrase. This court has already held that employee turnover, one "subsequent event," must be considered in deciding whether a new election or a bargaining order is the proper remedy. *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434 (D.C. Cir. 1972). *See also, NLRB v. American Cable Systems, Inc.*, 427 F.2d 446 (5th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970); *Hedstrom Co. v. NLRB*, 558 F.2d 1137 (3d Cir. 1977); *NLRB v. General Stencils, Inc.*, 472 F.2d 170 (2d Cir. 1972); *NLRB v. Western Drug*, 600 F.2d 1324 (9th Cir. 1979).

19. A third such situation was involved in *Local 57, Int'l Ladies' Garment Workers' Union v. NLRB*, 374 F.2d 295 (D.C. Cir.), *cert. denied*, 387 U.S. 942, 87 S.Ct. 2074, 18 L.Ed. 1328 (1967). In order to escape the Union, the employer discharged all its employees, closed its New York plant, and reopened substantially the same operation in Florida. This court refused to enforce a bargaining order at the new Florida location, concluding that even in light of the seriousness of the violation, totally depriving the Florida workers of their section 7 rights was unwarranted. "[T]he Board should not seek to 'discipline' the Employer at the expense of the new Florida employees. Such a remedy is, on its face, arbitrary; the Board ought not rob Peter to punish Paul." *Id.* at 304.

20. These are frequently described as "*Gissel*" cases, since the Supreme Court in that case examined in considerable detail the Board's power to issue a bargaining order in cases involving pre-election unfair labor practices. 395 U.S. at 610–16, 89 S.Ct. at 1938–41.

21. Other courts have recognized the analogy between the two situations, and pointed out that in withdrawal of recognition cases, like *Gissel* cases, bargaining orders pose a substantial risk of frustrating rather than furthering the purposes of the Act, since they may be contrary to the actual wishes of the employees. *Fremont Newspapers, Inc. v. NLRB*, 436 F.2d 665 (8th Cir. 1970) (bargaining order denied in withdrawal of recognition case). Even when the withdrawal of recognition is accompanied by independent unfair labor practices, the courts have several times concluded that a fair rerun election was impossible. *Daisy's Originals, Inc. v. NLRB*, 468 F.2d 493 (5th Cir. 1972); *Automated Business Systems v. NLRB*, 497 F.2d 262 (6th Cir. 1974). It would indeed be anomalous if the employees of an employer who withdrew recognition from an incumbent Union in good faith but without sufficient objective evidence automatically lost their free choice rights in the interests of deterrence, while the employees of an employer who committed deliberate unfair labor practices would have the opportunity to express their wishes in a rerun election unless the violations were so coercive that the Board could fairly determine that a free election was impossible.

22. Other courts have encountered the same problem with the Board's perfunctory conclusions that a bargaining order is appropriate. See the sharp criticism leveled at the Board's mechanical issuance of bargaining orders in *NLRB v. Armcor Industries, Inc.*, 98 L.R.R.M. 2441 (1978), *enforcement denied by equally divided court*, 588 F.2d 821 (3d Cir. 1978); *NLRB v. Western Drug*, 600 F.2d 1324 (9th Cir. 1979). In *Gissel* cases, several circuits now require detailed findings by the Board as to why a fair rerun election is not possible before they will enforce a bargaining order. *See, First Lake-*

would be so if the only interests to be balanced were those of the employer and the Union, or if it were clear that the workers' interests paralleled those of the Union. But as the Supreme Court made clear in *Gissel*, bargaining orders do not automatically flow from a refusal to bargain if it is not clear that the employees desire the Union as their representative.[23] A balance must be drawn in such cases between the various purposes of the Act. For example, if the employer's violation is deliberate and egregious enough, the interest in deterrence of future violations may override the employees' wishes, especially if it is likely that the workers' rejection of the Union flows from the Company's violations.

When the violation is less substantial or is committed in good faith, the interest in deterrence is less substantial as well. Correspondingly, the employees' rights to decide whether they want Union representation, and by which Union, should be given greater weight; the Board should make findings as to the likelihood of infringement of those rights and explain, if it should conclude that a bargaining order is nevertheless necessary, why other remedies would not suffice and why other purposes of the Act must outweigh the employees' rights.

The Board's decision in this case failed to satisfy this standard. It apparently regarded the employees' wishes as of no consequence whatsoever in determining a remedy. It provided us with no explanation of why those rights must be sacrificed to other purposes. Finally, its order reflects no attempt to minimize the burden on employees,[24] and there is no explanation as to why an accommodation of competing interests is impossible.

B. *The Propriety of the Board's Bargaining Order.* We now turn to specific factors in this case which convince us that issuance of a bargaining order would not be a reasonable exercise of discretion.

(1) *Passage of Time and Clear Expression of Employee Desires.* An extraordinary amount of time has elapsed since the initial refusal to bargain in the spring of 1973, most of which can be attributed to the Board and this court; thus deliberate delay by any party is not a factor in this case. More important, an extraordinary amount of time passed, nearly five and a half years, before the Board entered its remedial order, and during that time not only had there been, we assume, substantial turnover in the workplace, but the employees were provided an opportunity by the Board to express their wishes as to representation in an election certified as fair without objection from the Union. The question of whether the passage of so much time and intervening events are factors which should be taken into account by the Board in formulating a remedy is in much dispute among the courts, commentators and the Board itself. On the one hand, with the passage of time, any coercive effects of an unfair labor practice may dissipate, employee turnover may result in a work force with no interest in the Union, and a fair election might be held which accurately reflects uncoerced employee wishes as of the present time. On the other hand, holding a rerun election simply

---

*wood Associates, Inc. v. NLRB*, 582 F.2d 416 (7th Cir. 1978); *Kenworth Trucks v. NLRB*, 580 F.2d 55 (3d Cir. 1978).

23. *Gissel*, of course, involved unfair labor practices committed before any election was held, and the balance of interests at that point may appropriately place more weight on the employees' free choice. In withdrawal of recognition cases, deterrence and industrial stability emerge as important considerations. However, the fact that the balance may be different depending on the facts of the case does not mean that no balance need be drawn.

24. The Board has options available to temper the burden of a bargaining order on employee free choice. For instance, it might include in its order an explicit reminder that the employees may seek decertification after a reasonable time. *NLRB v. Drives, Inc.*, 440 F.2d 354 (7th Cir.), *cert. denied*, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971). *See also Garwin Corp.*, 153 NLRB 664 (1965) (order curtailed contract bar by providing that any contract resulting from the bargaining order would bar an election for only one year). Such a demonstration that the Board had considered and utilized its expertise to accommodate employee rights would entitle its order to great deference.

because of the passage of time rewards employer recalcitrance and offers no deterrence to future unfair labor practices.

■ While these considerations cut in opposite directions we do not believe they require either a rigid refusal to examine present conditions or automatic deference to possible present employee wishes. A balancing of competing interests among three parties, in a situation in which an innocent party must inevitably carry some of the burden of the remedy chosen, is never an easy task. In order to properly balance those interests, the Board should formulate its remedy in light of the violation with which it is faced *and* the conditions in the bargaining unit at the time it renders its decision.[25] One reason we respect the Board's exercise of discretion in setting remedies is that it is able to bring its expertise and insight to bear in finding a solution to the myriad unique and ever-changing relationships among employers, employees and Unions. A remedy, by its very nature, must be adjusted to fit the realities of the situation it is expected to resolve.

The courts have frequently referred to the passage of time and employee turnover as relevant considerations cutting against a choice of a bargaining order as a remedy; not decisive but certainly to be taken into account. *See NLRB v. Alvin J. Bart & Co.,* 598 F.2d 1267 (2d Cir. 1979); *NLRB v. Western Drug,* 600 F.2d 1324 (9th Cir. 1979); *NLRB v. Ship Shape Maintenance Co.,* 474 F.2d 434 (D.C. Cir. 1972). In this case we not only have an extraordinary delay between the initial refusal to bargain and the ultimate formulation of the remedy, with the resulting inevitable turnover in the work force, but we have a clear, uncoerced expression in the interim by the employees that they do not desire the Union

to represent them. There is no need to speculate from time and turnover to conclude that employee sentiment no longer favors the Union; we know it does not. The Board, however, takes the position that this undisputed fact is not a reason militating against a bargaining order. Since the Union is presumed[26] to have had majority support at the time the Company refused to bargain, in the Board's eyes the results of the subsequent election only prove that in fact the Company's unfair labor practice succeeded in dissipating the Union's majority. In order to prevent the Company from benefiting by its own wrong, it is therefore automatically necessary to order bargaining in spite of the employees' present desires. The passage of time, in the Board's view, in fact only exacerbates the wrong, since the longer the Union is wrongfully deprived of the opportunity to prove to the employees how much it could do for them as their bargaining representative, the more likely it is that support for the Union will dwindle.

■ In our view, this argument gives too much weight to the interests of the Union, too little to the statutory rights of the employees, and rests too much on speculation. In any case, its underlying rationale is inconsistent with the Supreme Court decisions in *Gissel* and with the Board's own practice as expressed in *Irving Air Chute Co.,* 149 NLRB 627 (1964), enf'd, 350 F.2d 176 (2d Cir. 1965). The inevitable implication of the Board's view is that *any* wrongful refusal to bargain can and should be remedied at any time by a bargaining order, regardless of employee desires, since the simple fact that no bargaining is occurring may be undercutting the Union's support. But in *Gissel,* the Supreme Court agreed with the Board's finding of unlawful

---

**25.** *See* note 18, *supra.* We need not explore here whether the Board has an independent duty to determine those conditions; in most cases, we expect, the parties can be counted on to bring relevant changes in circumstances to the attention of the Board.

**26.** Perhaps it is worth reemphasizing here that it has never been and probably cannot now be determined whether the Company was factual-

ly wrong in its conclusion seven years ago that the employees no longer supported the Union. We assume that they did only because of a Board-created presumption. It could be that the employees did not support the Union at that time, and continue today not to support the Union, unaffected by the employer's actions.

refusals to bargain combined with other, coercive, unfair labor practices, and still held that if possible, elections should be held to determine employee choice. 395 U.S. at 614, 89 S.Ct. at 1940. We recognize that *Gissel* was an initial recognition case, and this situation involves a withdrawal of recognition, but it seems to us that unlawful refusals to bargain are as likely, if not more likely, to dissipate support for a fledgling Union as for an established Union. The two situations are not, of course, identical; different policy considerations are implicated in the choice of a remedy. However, *Gissel* does clearly establish that an 8(a)(5) violation should not automatically trigger a bargaining order if there is a substantial possibility that the employees do not want the Union and that a fair election can be held. Employee section 7 rights thus play an important role in the selection of a remedy.

Similarly, in *Irving Air Chute*, the Board held that when an employer commits a section 8(a)(5) violation before an election is held (for example, by refusing to accept the results of its own poll demonstrating a Union majority), no bargaining order will issue as a remedy if the Union has proceeded to an election and its election loss is not set aside after the filing of objections. The Board distinguishes its practice in *Irving Air Chute* by noting, once again, the different factual context and different policy

considerations, and concluding that the Union should not be held to have waived its 8(a)(5) rights here because it elected to try to reestablish a bargaining relationship as quickly as possible, after exhausting its remedies before the Board. This may well be true, and we do not dispute it here, but the Board is ignoring the *implications* of *Irving Air Chute*. The practice of the Board as expressed in that case must be predicated, as was *Gissel*, on an assumption that a fair election is not necessarily precluded by a simple refusal to bargain in spite of the fact that during the time when the Company should be bargaining, the Union may be losing its majority through no fault of its own. If in a case like *Irving Air Chute* the policy in favor of effectuating the freely expressed wishes of the employees outweighs both any interest in deterrence (apparently even of a bad faith refusal to bargain) and the bargaining rights of the Union, then surely in this case the expressed wishes of the employees must be accorded a heavy weight in the balance.[27]

(2) *Deterrence Rationale.* The Board asserted that it selected a bargaining order because it was "obviously appropriate and, we would say, necessary to remedy effectively the unlawful conduct and to return the situation to what it was prior to the unlawful withdrawal of recognition." Of course, it is clear that the Board cannot

---

27. We acknowledge an apparent tension between our decision today and the discussion leading up to our holding in *Teamsters Local 769* four years ago that this case was not moot and that the Board had not adequately explained its finding of no unfair labor practice. During the course of that appeal, the Company argued that the case was, for all practical purposes, moot, because of the Board's rule under *Irving Air Chute* that a bargaining order would not issue after an election lost by the union and certified as fair. It argued the only available remedy was a cease and desist order, even if the Board were to be reversed.

This court held that should the Board find a violation, its remedial powers would not be so limited. We said, "At least at this stage of the proceedings, we are not prepared to say that . . . the Board would be powerless to mandate a new election or even to issue a bargaining order." 532 F.2d at 1388. The court thought that the facts in the instant case were

distinguishable from *Irving Air Chute*, and concluded that "[w]e do not believe the Board would lack the power—and will not speculate as to whether it would have the will—to create an exception to its rules in this case." *Id.*

There is of course no conflict between this court's *holdings* in the two appeals. We agree that the case was not moot, and that *Irving Air Chute* does not control the remedy. We find, however, no implication drawn from dicta in the earlier case to the effect that a bargaining order would be appropriate *now*. Our earlier opinion plainly suggested that even at that point, a bargaining order would be at the outer boundaries of the Board's powers, and four years have passed since then. Even at that time, we believe the Board would have had to provide powerful reasons and clear support for a decision to issue a bargaining order. It has not done so, and the time when a bargaining order might have been appropriate is now long since past.

turn the clock back seven years, but we assume that it means to say that restoring the status quo, insofar as it is possible, will prevent the Company from benefiting from its own wrongs, and thus will serve as a deterrent to future misconduct.

Deterrence is, of course, a legitimate remedial purpose and the need for deterrence has resulted in many bargaining orders in cases where it is clear the employees no longer support the Union.[28] However, in the circumstances of this case, a bargaining order would cross the line from a permissible remedy designed to deter future violations to an impermissible punitive measure. The potential deterrent effect of a bargaining order is lessened in a case in which the initial violation was marginal and apparently committed in good faith. Furthermore, the Company has an otherwise clean labor relations record, and there is no suggestion but that if the Union were able to persuade a majority of workers that they would be better off with it as their representative, the Company would willingly bargain with the Union. We can find little in this Company's conduct which requires deterrence. Facts suggesting that a bargaining order would have little or no deterrent value have been heavy factors in prior decisions not to enforce proposed bargaining orders. *See, NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434 (D.C. Cir. 1972); *NLRB v. General Stencils, Inc.*, 472 F.2d 170 (2d Cir. 1972).

A brief resummary of the facts of this case is appropriate to demonstrate the narrowness of our holding. The initial refusal to bargain occurred seven years ago, in a context that suggests the Company was proceeding in good faith, though in violation of the law. We have no way of knowing in fact whether the employees were in favor of the Union at that point, though we recognize the presumption that they were. Two years later, the Union requested an election, which was conducted in an atmosphere free from coercive unfair labor practices, and lost decisively. Five *more* years have passed since then, during which inevitable employee turnover has occurred. If any of these facts were altered, we would be more willing to defer to the Board, in spite of the inadequacy of its opinion. If the Company's violation appeared to be in bad faith, or were accompanied by other unfair labor practices, the deterrent effect of a bargaining order would be more important. If there is no evidence other than mere passage of time to suggest the employees no longer support the Union, the interest in restoring a previously established and wrongfully disrupted bargaining relationship would perhaps override the possibility that employee sentiment had changed. No remedy, especially when competing interests of three parties are involved, can be wholly satisfactory after the passage of so many years. Given the facts of this case, however, we must conclude that a bargaining order would be an unreasonable and unwise remedy, contributing to industry unrest rather than restoring peace,[29] and thus frustrating the fundamental purposes of the Act.

This case must be remanded to the Board, since the language of its proposed cease and desist order and notices to be posted were premised on the issuance of a bargaining order. We do not know what present conditions in the Company's plant are, but the Board may well conclude that a rerun election would be appropriate, after the employees are informed that the Company violated the Act when it refused to bargain with the Union, and that the Union's inabil-

---

28. *See, e. g., NLRB v. A. W. Thompson, Inc.*, 449 F.2d 1333 (5th Cir. 1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972), which enforced a bargaining order against an employer who had set out on a "course of conduct which . . . was calculated to discourage adherence to the union cause," violating sections 8(a)(1), (a)(5), and (d), in spite of the fact that a representative of the employees, representing 81 percent of the bargaining unit, intervened in the proceeding in support of the Company.

29. On a purely practical level, we would be curious to know the results of those bargaining orders which the Board has imposed against the wishes of the employees. It seems that effective bargaining would be very difficult in such a situation.

ity to represent their interests in the years following was a result of that unlawful conduct. The Board is free to consider this and other possible remedies, short of imposing a bargaining order, on remand.

ROBB, Circuit Judge, concurring in part, dissenting in part:

I agree with the conclusion that in the circumstances of this case a bargaining order is not warranted; but I would go further. In my judgment the evidence, which is well set out in Judge Wald's opinion, justified the company in withdrawing recognition from the union and refusing to bargain with it as the representative of the company's employees. Accordingly I would deny enforcement of the Board's cease and desist order.